## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

AJ BROWN,

      Plaintiff,

vs.

ALEX WAGNER, ZAIN YAQUB, VLAD
SOMOV, KYLE COUTURIER, FIRST
GEN INDUSTRIES LTD., and FIRST
GEN FINANCIAL LTD

      Defendants.

CASE NO:_____

**COMPLAINT – CIVIL ACTION:**
1) BREACH OF CONTRACT
2) UNJUST ENRICJMENT
3) FRAUD IN THE INDUCEMENT
4) AIDING AND ABETTING FRAUD
5) NEGLIGENT MISREPRESENTATION
6) CIVIL CONSPIRACY TO DEFRAUD

**JURY TRIAL DEMANDED**

## VERIFIED COMPLAINT

1.    Plaintiff, AJ BROWN (hereinafter referred to as "**BROWN**" or "**PLAINTIFF**"), by and through his undersigned counsel, hereby files this action for damages against ALEX WAGNER, an individual (hereinafter referred to as "**WAGNER**"), ZAIN YAQUB, an individual (hereinafter referred to as "**YAQUB**"), VLAD SOMOV, an individual (hereinafter referred to as "**SOMOV**"), KYLE COUTURIER, an individual (hereinafter referred to as "**COUTURIER**"), FIRST GEN INDUSTRIES, a Virginia corporation (hereinafter referred to as "**FIRSTGENI**"), and FIRST GEN FINANCIAL LTD, a New York corporation (hereinafter referred to as "**FIRSTGENF**", with FIRSTGENI and FIRSTGENF collectively referred to in the singular as "**FIRSTGEN**", and with WAGNER, YAQUB, SOMOV, COUTURIER, FIRSTGENI and FIRSTGENF hereinafter collectively referred to as the "**DEFENDANTS**",) and alleges:

## PARTIES, JURISDICTION AND VENUE

2.      Plaintiff BROWN is an individual and resident of Hillsborough County, Florida. Accordingly, for jurisdictional purposes, BROWN is a citizen of Florida.

3.      Defendant WAGNER is an individual, is *sui juris*, is not in the military, and, on information and belief, is a resident of Fairfax County, Virginia. Accordingly, for jurisdictional purposes, WAGNER is a citizen of Virginia.

4.      Defendant YAQUB is an individual, is *sui juris,* is not in the military, and, on information and belief, is a resident of Miami-Dade County, Florida. Accordingly, for jurisdictional purposes, YAQUB is a citizen of Florida.

5.      Defendant SOMOV is an individual, is *sui juris*, is not in the military, and, on information and belief, is a resident of New York County, New York. Accordingly, for jurisdictional purposes, SOMOV is a citizen of New York.

6.      Defendant COUTURIER is an individual, is *sui juris*, is not in the military, and, on information and belief, is a resident of Hillsborough County, Florida. Accordingly, for jurisdictional purposes, COUTURIER is a citizen of Florida.

7.      Defendant FIRSTGENI is incorporated in Virginia. Accordingly, for jurisdictional purposes, FIRSTGENI is a citizen of Virginia.

8.      Defendant FIRSTGENF is, on information and belief, either incorporated in the State of New York or is a fictitious name for FIRSTGENI. Accordingly, for jurisdictional purposes, FIRSTGENF is either a citizen of New York or a citizen of Virginia.

9.      The matter in controversy exceeds the value of $75,000.00, exclusive of interest and costs.

10.     Accordingly, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, and the laws of the State of Florida should be applied to this dispute.

11.     "[A] federal court sitting in diversity will apply the choice of law rules for the state in which it sits." *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1139 (11th Cir. 2005) (*citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941)). As a preliminary matter, a court must characterize what type of legal issue a case presents. *See Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007). Once that determination has been made, then the court will apply the choice of law rules that apply to that legal issue in the state which it sits.

12.     This Court has personal jurisdiction over Defendants because Defendants have (a) transacted business in Florida; (b) established a call center in Florida; (c) placed telephone calls to Florida; (d) sent emails that arrived in Florida; (e) mailed documents to Florida; (f) sent and received wires from Florida; and (g) immersed themselves in transacting business and in business entities in Florida.

13.     Venue is proper in the United States District Court for the Middle District of Florida, Tampa Division, pursuant to 28 U.S.C. § 1391 (b)(2), because a substantial part of the events or omissions giving rise to the present claims occurred in this judicial district.

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 on the basis that the amount in controversy exceeds Seventy-Five Thousand and 00/100 ($75,000.00)

15.     All conditions precedent to bringing of this action have occurred, been fulfilled, or have been waived.

## FACTUAL BACKGROUND

16.    In the fall of 2020, BROWN met WAGNER while he was working as a door-to-door sales representative for Initiate Solar, LLC.

17.    BROWN and WAGNER became friends and would often discuss ideas each had for various types of businesses.

18.    In December 2020, WAGNER solicited BROWN, as well as many other individuals, to invest in a dropshipping[1] company[2].

19.    No business plan, financials, risk factors, or other information about FIRSTGENI was provided, nor was there any effort by WAGNER to ascertain if BROWN or any of the other individuals that were solicited by WAGNER to invest were "accredited investors", as defined in 17 CFR § 230.501, or met higher standards like "qualified purchasers", as defined in 15 USC § 80a-2(a)(51).

20.    BROWN ultimately decided not to invest at that time.

21.    Nonetheless, WAGNER and BROWN would occasionally speak by phone, with WAGNER telling BROWN that his company was performing well.

22.    A few years later, in June 2022, WAGNER and BROWN reconnected and discussed starting a business consulting corporations and companies on how to obtain Employee Retention Credit (hereinafter referred to as "**ERC**").[3]

---

[1] Dropshipping is an e-commerce order fulfillment method where an online store sells products to customers but doesn't keep any inventory; instead, when a customer places an order, the store owner purchases the item from a third-party supplier who then ships it directly to the customer.

[2] WAGNER started First Gen Industries Ltd. [Entity ID 11143066], a Virginia stock corporation, on December 5, 2020 to do the dropshipping he and BROWN had discussed.

[3] The Employee Retention Credit (ERC) – sometimes called the Employee Retention Tax Credit or ERTC – is a refundable tax credit for certain eligible businesses and tax-exempt organizations that had employees and were affected during the COVID-19 pandemic

23.    Again, no business plan, financials, risk factors, or other information about FIRSTGEN was provided, nor was there any effort by WAGNER to ascertain if BROWN was an "accredited investor", as defined in 17 CFR § 230.501, or if he met higher standards like that of a "qualified purchaser", as defined in 15 USC § 80a-2(a)(51).

24.    Relying on WAGNER's representations, promises, and guarantees, BROWN worked with WAGNER from June 2022 through September 2022 to further develop a business plan to scale a sales company, which would include a full call center to maximize commissions from Bottom Line Savings, a division of Bottom Line Concepts, LLC, a Florida limited liability company (hereinafter referred to as '**BOTTOM LINE**").

25.    BOTTOMLINE was to provide fulfillment services for ERC customers signed-up by FIRSTGEN and pay FIRSTGEN a commission based on each ERC customer successfully signing-up with BOTTOMLINE.

26.    WAGNER suggested that he and BROWN not start a new company but rather use FIRSTGENI to start the new ERC consulting business.

27.    WAGNER then changed the business model for FIRSTGEN and expressly solicited BROWN to invest in FIRSTGEN.

28.    BROWN did not have the necessary funds to invest and was in no manner an accredited investor or qualified purchaser.

29.    When BROWN informed WAGNER that he did not have the funds to invest in FIRSTGEN, WAGNER told BROWN to contact a friend of WAGNER, MICHAEL DURAN ("**DURAN**"), whom WAGNER said was a "credit card consultant."

30.    WAGNER told BROWN that he should use DURAN to get credit cards in BROWN's name and then have FIRSTGEN use the cards.

31.    WAGNER assured BROWN that his investment in FIRSTGEN would be protected and profitable.

32.    DURAN successfully obtained credit cards for BROWN with **ONE HUNDRED AND EIGHTY THOUSAND (US$180,000.00)** (hereinafter referred to as the "**INITIAL INVESTMENT**") in available credit.

33.    WAGNER told BROWN numerous times that the INITIAL INVESTMENT was secured by WAGNER and FIRSTGEN, and that BROWN would be paid back the INITIAL INVESTMENT from the revenue generated by FIRSTGEN.

34.    BROWN, at the solicitation, promise and guaranty of WAGNER, then provided the credit cards for use by FIRSTGEN (e.g., for operating capital and purchasing leads for FIRSTGEN.)

35.    In early December 2022, WAGNER told BROWN that they should both execute employment agreements with FIRSTGENI so that they could be paid as employees and not take profit disbursements or draws until FIRSTGENI was more established.

36.    WAGNER provided an "employment agreement" (hereinafter referred to as the "**AGREEMENT**") to BROWN, and informed BROWN that WAGNER had made one for himself as well that mirrored the same terms as the one presented by WAGNER to BROWN.

37.    The AGREEMENT is replete with material errors, including, but not limited to, referring to BROWN as a female (Section 1.02, Positions and Duties, "shall devote her" and "all of her business"; Section 1.04, Probationary Period, "until she has completed";), and a choice of applicable law (Section 6.04) and Jurisdiction and Venue (Section 6.07) that (a) has no reasonable connection or nexus to either BROWN or FIRSTGEN, nor the subject matter of the AGREEMENT; (b) violates the public policy of the State of Texas, which seeks to limit its courts

to determine disputes that have some touchstone in the State of Texas; and (c) was only entered in the AGREEMENT by WAGNER to artificially limit BROWN's ability to seek a court of competent jurisdiction's assistance, thereby violating fundamental legal principles.

38.     On or about December 21, 2022, relying on the representations and assurances of WAGNER, BROWN e-signed the AGREEMENT.

39.     Later in 2022, BROWN hired the first member of the sales team, COUTURIER.

40.     BROWN trained COUTURIER on the ERC sales model he and WAGNER had created, using sales materials such as videos, notes and recordings, that BROWN had created.

41.     WAGNER was to handle all administrative, corporate, financial and legal matters, and BROWN was to build and manage the operations and sales system used to manage and fulfill all deals. This included ensuring all documentation was properly submitted and uploaded.

42.     The operational systems created by BROWN worked so well that BOTTOM LINE elected to use them to enhance their efficiency and profitability.

43.     BROWN worked directly with BOTTOM LINE project managers to streamline processes and reduce friction, enabling quicker deal closures and better payouts for referral partners.

44.     In approximately April, 2023, BROWN noticed that WAGNER was bringing on what WAGNER said were "new investors" to FIRSTGEN.

45.     After doing some investigation, BROWN learned that these "new investors" were actually victims who had invested in WAGNER's botched dropshipping endeavor.

46.     BROWN then began looking into the finances of FIRSTGEN, as his trust in WAGNER dissipated when BROWN learned that WAGNER had "added" owners to FIRSTGEN without his knowledge or consent.

47.    As BROWN became more concerned about WAGNER's actions, WAGNER conspired with, and materially aided and abetted, YAQUB, COUTURIER and SOMOV to make material misrepresentations about the finances of FIRSTGEN to BROWN so that BROWN would allow FIRSTGEN to continue to use his personal credit cards.

48.    When WAGNER concluded that BROWN would not cease his forensic analysis of FIRSTGEN's finances, WAGNER orchestrated a complete cessation of any payments to BROWN and forced BROWN out of FIRSTGEN.

49.    Between September 2022 and September 2023, FIRSTGEN successfully coordinated ERC refunds totaling **ONE HUNDRED AND NINETY MILLION, NINE HUNDRED AND SIXTY THOUSAND, ONE HUNDRED AND THIRTY FIVE AND 86/100 DOLLARS (US$190,960,135.86)** (hereinafter referred to as the "**ERC REFUNDS**")

50.    Based on the commission structure that was used by FIRSTGEN, BROWN was to receive a total commission of **SEVEN MILLION AND NO/100 DOLLARS (US$7,000,000.00)** from the ERC REFUNDS (hereinafter referred to as the "**ERC COMMISSION**").

51.    BROWN only received **FORTY THOUSAND AND NO/100 DOLLARS (US$40,000.00)** of the ERC Commission to which he was entitled.

52.    BROWN has never received any profit distributions, draws, or other member compensation from FIRSTGEN, despite being an owner.

53.    BROWN has never received any repayment of the **ONE HUNDRED AND EIGHTY THOUSAND AND NO/100 DOLLARS (US$180,000.00)** he invested in FIRSTGEN.

54.    FIRSTGEN is therefore indebted to BROWN for ***a minimum of*** **SEVEN MILLION, ONE HUNDRED AND FORTY THOUSAND AND NO/100 (US$7,140,000.00,)**

plus an equal amount that was paid to WAGNER as profit distributions, draws, or other compensation for WAGNER being a member of FIRSTGEN.

55.     BROWN has had to retain undersigned counsel to enforce his rights and is obligated to pay such counsel.

56.     All conditions precedent to bringing this action have occurred or have been waived.

## COUNT I
### (*Breach of Contract Claim as to FIRSTGENI*)

57.     PLAINTIFF sues FIRSTGENI for damages that exceed $75,000.00 for breach of contract.

58.     PLAINTIFF realleges and incorporates herein by reference the allegations, statements, and definitions of paragraphs 1 through 56, above, as if fully stated again herein.

59.     PLAINTIFF and FIRSTGENI entered into an "employment agreement" (hereinafter referred to as the "**AGREEMENT**"), which is a valid and binding agreement contemplating payment by FIRSTGENI to PLAINTIFF so that he would be paid as an employee and not just as owner. A true and accurate copy of the AGREEMENT is attached hereto as *Exhibit A* and incorporated herein by reference.

60.     Although PLAINTIFF disputes the legality, application and enforceability of Article VI, Section 6.04 (Applicable Law) and Article VI, Section 6.07 (Jurisdiction and Venue) of the AGREEMENT, PLAINTIFF asserts that the compensation rates as described in Article II, Section 2.01 (Base Compensation) are accurate and controlling.

61.     This severance of Article VI, Section 6.04 (Applicable Law) and Article VI, Section 6.07 (Jurisdiction and Venue) is contemplated in the AGREEMENT in Article VI, Section 6.08 (Severability) which states that:

"If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those to which it is held to be invalid or unenforceable, shall not be affected thereby."

62.     Therefore, the remaining sections of the AGREEMENT, including Article II, Section 2.01 (Base Compensation), are unaffected by the proper deletion of Article VI, Section 6.04 (Applicable Law) and Article VI, Section 6.07 (Jurisdiction and Venue).

63.     PLAINTIFF has fully performed his obligations under the AGREEMENT by building and managing the operations and sales system of FIRSTGEN used to manage and fulfill all deals as required under the AGREEMENT.

64.     Notwithstanding, FIRSTGENI has materially breached AGREEMENT by failing timely to perform its obligations under the AGREEMENT.

65.     FIRSTGENI's breach has resulted in substantial damages to PLAINTIFF, namely, costs incurred in attempt to minimize the effect of FIRSTGENI's breach.

**WHEREFORE**, PLAINTIFF. demands judgment against FIRSTGENI for damages in an amount to be determined and all other relief the Court may deem just and proper.

## COUNT II
## (IN THE ALTERNATIVE)
### (*Unjust Enrichment Claim as to FIRSTGENI*)

66.     PLAINTIFF sues FIRSTGENI for damages that exceed $75,000.00 for unjust enrichment.

67.     PLAINTIFF realleges and incorporates herein by reference the allegations, statements, and definitions of paragraphs 1 through 56, above, as if fully stated again herein.

68.     PLAINTIFF conferred a benefit on FIRSTGENI in that PLAINTIFF provided financial support and operational services to FIRSTGENI.

69.     FIRSTGENI accepted financial support and operational services from PLAINTIFF.

70.     To date, FIRSTGENI has failed to pay PLAINTIFF for the financial support and operational services it accepted, and remains liable for its obligations to PLAINTIFF in exchange for PLAINTIFF providing said financial support and operational services to FIRSTGENI.

71.     FIRSTGENI was aware of the financial support and operational services PLAINTIFF was providing to FIRSTGENI, of the benefits those financial support and operational services provided to FIRSTGEN, and of PLAINTIFF's expectation of being paid for the financial support and operational services by FIRSTGENI.

72.     FIRSTGENI accepted and retained the benefit of the financial support and operational services provided by PLAINTIFF.

**73.**     FIRSTGENI has been unjustly enriched as a result, and, under the circumstances, it would be inequitable for FIRSTGENI to retain the benefits of PLAINTIFF's financial support and operational services without paying PLAINTIFF for the value of the financial support and operational services.

**WHEREFORE**, PLAINTIFF. demands judgment against FIRSTGENI. for damages in an amount to be determined and all other relief the Court may deem just and proper.

**COUNT III**
**(*Fraud/Fraudulent Misrepresentation/Fraudulent*
*Inducement as to WAGNER and FIRSTGEN*)**

74.     PLAINTIFF sues WAGNER and FIRSTGEN for damages that exceed $75,000.00 for fraud, fraudulent misrepresentation and fraudulent inducement.

75.     PLAINTIFF realleges and incorporates herein by reference the allegations, statements, and definitions of paragraphs 1 through 56, above, as if fully stated again herein.

76.     Through his use of FIRSTGEN and individually, WAGNER directly and proximately harmed BROWN by (a) soliciting BROWN to invest in FIRSTGEN when WAGNER knew, or should have known, that BROWN did not qualify as an "accredited investor", as defined in 17 CFR § 230.501, or as a "qualified purchaser", as defined in 15 USC § 80a-2(a)(51); (b) coercing and directing BROWN to use the "services" of DURAN to get credit cards in BROWN's name with available credit of **ONE HUNDRED AND EIGHTY THOUSAND (US$180,000.00)**, for which WAGNER and DURAN knew or should have known that BROWN should not have qualified; (c) falsely representing to BROWN that WAGNER had executed an essentially identical agreement with FIRSTGEN, when WAGNER had not done so, to coerce BROWN to sign the AGREEMENT; (d) forcing BROWN to accept additional "investors" at FIRSTGEN when in fact these individuals were previously victimized by WAGNER and their inclusion in FIRSTGEN appears to have been an effort by WAGNER to temporarily ameliorate their concerns and complaints; (e) falsifying the operational, administrative and financial records to block BROWN from receiving his ERC COMMISSION and any recoupment of the INITIAL INVESTMENT; and (f) concealing his intentions and orchestrating the improper removal of BROWN from his rightful position in FIRSTGEN as an employee and investor.

77.     From September 2022 and September 2023, PLAINTIFF relied upon falsified financial documents created and provided by WAGNER, WAGNER's false representations and statements to BROWN regarding FIRSTGEN, as being accurate and genuine.

78.     By providing inaccurate financial information to PLAINTIFF, and willfully, maliciously, and intentionally withholding material factual information from PLAINTIFF, WAGNER and

FIRSTGEN willfully, maliciously, and intentionally misled PLAINTIFF about the operating and financial condition of FIRSTGEN, including concealing improper withdrawals made by WAGNER from FIRSTGEN accounts for WAGNER's personal nonbusiness use and enjoyment, thereby directly and proximately harming BROWN.

79.     Between September 2022 and September 2023, PLAINTIFF invested **ONE HUNDRED AND EIGHTY THOUSAND AND NO/100 DOLLARS (US$180,000.00)** in FIRSTGEN, but would not have done so if WAGNER and FIRSTGEN had not willfully, maliciously, and intentionally misled PLAINTIFF about the operating and financial condition of FIRSTGEN, including, but not limited to, WAGNER's improper withdrawals made from FIRSTGEN accounts for WAGNER's personal nonbusiness use and enjoyment.

80.     In early December 2022, WAGNER told BROWN that they should both execute employment agreements with FIRSTGEN so that they could be paid as employees and not take any profit distributions or draws until such time as FIRSTGEN were more established financially.

81.     WAGNER provided the AGREEMENT to BROWN, and informed BROWN that WAGNER had made one for himself as well that mirrored the same terms as the one presented by WAGNER to BROWN.

82.     Prior to, and in executing, the AGREEMENT and also in BROWN providing financial support to FIRSTGEN, WAGNER and FIRSTGEN made the above-referenced statements and representations of material fact regarding the contemplated ERC COMMISSION for BROWN, the validity of BROWN's ownership interest in FIRSTGEN, and the security against any loss by BROWN of the INITIAL INVESTMENT.

83.     WAGNER's and FIRSTGEN's material acknowledgements and representations made to PLAINTIFF and in the AGREEMENT were false, and WAGNER and FIRSTGEN never intended

to abide by the terms of the Agreement and, instead, have failed to pay what was due and owing to PLAINTIFF.

84.    WAGNER and FIRSTGEN intended that PLAINTIFF rely upon WAGNER and FIRSTGEN's false statements and representations in respect of the AGREEMENT, the financial records of FIRSTGEN, and the risk associated with the INITIAL INVESTMENT so that PLAINTIFF would execute the AGREEMENT, provide services and financial support, and, among other things, forbear his taking actions to enforce other remedies.

85.    PLAINTIFF justifiably relied upon WAGNER and FIRSTGEN's representations regarding the operating and financial condition of FIRSTGEN, their acknowledgement of the amounts owed to PLAINTIFF and their intent to repay the amount owed to PLAINTIFF according to specific terms.

86.    WAGNER and FIRSTGEN, jointly and severally, directly and proximately injured PLAINTIFF as a result of PLAINTIFF's justifiable reliance on the operating and financial condition of FIRSTGEN, WAGNER and FIRSTGEN's false statements and representations in respect of the AGREEMENT and PLAINTIFF having been denied both his rightful ERC COMMISSION and the return of his INITIAL INVESTMENT.

**WHEREFORE**, PLAINTIFF demands judgment against WAGNER and FIRSTGEN for compensatory damages of not less than **SEVEN MILLION, ONE HUNDRED AND FORTY THOUSAND AND NO/100 (US$7,140,000.00,)** calculated as a rightful ERC COMMISSION of **SIX MILLION NINE HUNDRED AND SIXTY THOUSAND AND NO/100 DOLLARS (US$6,960,000.00)** to BROWN and the return of BROWN's INITIAL INVESTMENT of **ONE HUNDRED AND EIGHTY THOUSAND AND NO/100 DOLLARS (US$180,000.00)**,

reserving the right to seek punitive damages later upon a proper proffer, prejudgment interest, and court costs.

### COUNT IV
#### (*Action for Aiding and Abetting Fraud as to WAGNER, YAQUB, COUTURIER and SOMOV*)

87.    PLAINTIFF sues WAGNER, YAQUB and SOMOV for damages that exceed $75,000.00 for aiding and abetting fraud.

88.    PLAINTIFF realleges and incorporates herein by reference the allegations, statements, and definitions of paragraphs 1 through 56, above, as if fully stated again herein.

89.    Through his use of FIRSTGEN and individually, WAGNER directly and proximately harmed BROWN by (a) soliciting BROWN to invest in FIRSTGEN when WAGNER knew, or should have known, that BROWN did not qualify as an "accredited investor", as defined in 17 CFR § 230.501, or as a "qualified purchaser", as defined in 15 USC § 80a-2(a)(51); (b) coercing and directing BROWN to use the "services" of DURAN to get credit cards in BROWN's name with available credit of **ONE HUNDRED AND EIGHTY THOUSAND (US$180,000.00)**, for which WAGNER and DURAN knew or should have known that BROWN should not have qualified; (c) falsely representing to BROWN that WAGNER had executed an essentially identical agreement with FIRSTGEN, when WAGNER had not done so, to coerce BROWN to sign the AGREEMENT; (d) forcing BROWN to accept additional "investors" at FIRSTGEN when in fact these individuals were previously victimized by WAGNER and their inclusion in FIRSTGEN appears to have been an effort by WAGNER to temporarily ameliorate their concerns and complaints; (e) falsifying the operational, administrative and financial records to block BROWN from receiving his ERC COMMISSION and any recoupment of the INITIAL INVESTMENT; and

(f) concealing his intentions and orchestrating the improper removal of BROWN from his rightful position in FIRSTGEN as an employee and investor.

90.    YAQUB, COUTURIER and SOMOV had actual knowledge of, or remained willfully blind to, the fraud being perpetrated by WAGNER against BROWN, and lent substantial cooperation and assistance to WAGNER by falsifying financial documents, confirming WAGNER's false statements to BROWN as accurate, and denying BROWN the ability to properly monitor his investment in FIRSTGEN.

91.    From September 2022 and September 2023, PLAINTIFF relied upon falsified financial documents, WAGNER's false statements to BROWN regarding FIRSTGEN, and the reassurances of YAQUB, COUTURIER and SOMOV regarding WAGNER' statements as being accurate and genuine.

92.    By providing inaccurate financial information to PLAINTIFF, and withholding material factual information from PLAINTIFF, WAGNER, YAQUB, COUTURIER and SOMOV misled PLAINTIFF about the operating and financial condition of FIRSTGEN, including improper withdrawals made by WAGNER from FIRSTGEN accounts for his own use and enjoyment.

93.    Between September 2022 and September 2023, PLAINTIFF invested **ONE HUNDRED AND EIGHTY THOUSAND AND NO/100 DOLLARS (US$180,000.00)** in FIRSTGEN, but would not have done so if WAGNER, with the substantial cooperation and assistance of YAQUB, COUTURIER and SOMOV had not willfully, maliciously, and intentionally misled PLAINTIFF about the operating and financial condition of FIRSTGEN, including, but not limited to, WAGNER's improper withdrawals made from FIRSTGEN accounts for WAGNER's personal nonbusiness use and enjoyment.

94.    As a direct and proximate result of the wrongdoings of WAGNER, YAQUB, COUTURIER and SOMOV, PLAINTIFF has been denied his rightful ERC COMMISSION, the return of his INITIAL INVESTMENT, and has been obligated to retain counsel to enforce his rights.

**WHEREFORE**, PLAINTIFF demands judgment against WAGNER, YAQUB, COUTURIER and SOMOV for compensatory damages of not less than **SEVEN MILLION, ONE HUNDRED AND FORTY THOUSAND AND NO/100 (US$7,140,000.00,)** calculated as a rightful ERC COMMISSION of **SIX MILLION NINE HUNDRED AND SIXTY THOUSAND AND NO/100 DOLLARS (US$6,960,000.00)** to BROWN and the return of BROWN's INITIAL INVESTMENT of **ONE HUNDRED AND EIGHTY THOUSAND AND NO/100 DOLLARS (US$180,000.00)**, reserving the right to seek punitive damages later upon a proper proffer, prejudgment interest, and court costs.

### COUNT V
### (IN THE ALTERNATIVE)
#### (*Negligent Misrepresentation as to WAGNER and FIRSTGEN*)

95.    PLAINTIFF sues WAGNER and FIRSTGEN for damages that exceed $75,000.00 for negligent misrepresentation.

96.    PLAINTIFF realleges and incorporates herein by reference the allegations, statements, and definitions of paragraphs 1 through 56, above, as if fully stated again herein.

97.    Should WAGNER and FIRSTGEN's conduct as set-forth above not rise to the level of fraudulent inducement, PLAINTIFF pleads in the alternative that WAGNER and FIRSTGEN's conduct consisted of (a) negligent misrepresentations which induced PLAINTIFF to make the INITIAL INVESTMENT; (b) misstatement of material facts about the finances of FIRSTGEN; and (c) concealing WAGNER's intentions to remove BROWN from FIRSTGEN (and thereby deny BROWN of, *inter alia*, his ERC COMMISSION) based upon:

    a.  False statements;

    b.  Made by WAGNER, individually, and as agent for FIRSTGEN;

    c.  Known by WAGNER and FIRSTGEN to be false at the time they were made;

    d.  For the purpose of inducing PLAINTIFF into make the INITIAL INVESTMENT and sign the AGREEMENT;

    e.  Concerning facts material to the finances of FIRSTGEN;

    f.  Upon which PLAINTIFF:

        i.  relied; and

        ii.  with such reliance being reasonable under the circumstances;

    g.  That the false statements were known or should have been known by WAGNER and FIRSTGEN to be false at the time that they were made.

98.    WAGNER and FIRSTGEN had an affirmative duty not to make statements they knew, or should have know, to be false for the purposes of inducing third parties to do business with them.

99.    PLAINTIFF reasonably relied upon the false statements, and, as a direct and proximate cause of that reliance, PLAINTIFF was damaged.

100.    PLAINTIFF therefore seeks to recover the damages he has suffered as a result of WAGNER and FIRSTGEN's negligent misrepresentation.

    **WHEREFORE**, PLAINTIFF demands judgment against WAGNER and FIRSTGEN for compensatory damages of not less than **SEVEN MILLION, ONE HUNDRED AND FORTY THOUSAND AND NO/100 (US$7,140,000.00,)** calculated as a rightful ERC COMMISSION of **SIX MILLION NINE HUNDRED AND SIXTY THOUSAND AND NO/100 DOLLARS (US$6,960,000.00)** to BROWN and the return of BROWN's INITIAL INVESTMENT of **ONE HUNDRED AND EIGHTY THOUSAND AND NO/100 DOLLARS (US$180,000.00),**

reserving the right to seek punitive damages later upon a proper proffer, prejudgment interest, and court costs.

## <u>COUNT VI</u>
### (*Civil Conspiracy to Defraud as to WAGNER, YAQUB, COUTURIER and SOMOV*)

101.    PLAINTIFF sues WAGNER, YAQUB, COUTURIER and SOMOV (hereinafter referred to individually or collectively referred to as the "**CONSPIRATORS**") for damages that exceed $75,000.00 for civil conspiracy to defraud.

102.    PLAINTIFF realleges and incorporates herein by reference the allegations, statements, and definitions of paragraphs 1 through 56, above, as if fully stated again herein.

103.    WAGNER, YAQUB, COUTURIER and SOMOV knowingly and voluntarily acted in concert to conceal the unlawfulness of WAGNER's actions and the provision of willfully misleading, falsified and inaccurate financial information to PLAINTIFF.

104.    WAGNER, YAQUB, COUTURIER and SOMOV knowingly and voluntarily acted in concert to withhold material factual information, which the CONSPIRATORS knew would likely cause BROWN to not make the INITIAL INVESTMENT or continue to provide financial and operational support for FIRSTGEN.

105.    The willful, malicious and intentional misconduct by WAGNER, YAQUB, COUTURIER and SOMOV constituted a fraud upon PLAINTIFF. The conspiracy included false statements of material facts and the omission/concealment of material facts.

106.    As described herein, WAGNER, YAQUB, COUTURIER and SOMOV engaged in "unlawful and fraudulent" acts in furtherance of the conspiracy.

107.    WAGNER, YAQUB, COUTURIER and SOMOV knowingly and voluntarily furthered, perpetuated, and concealed the conspiracy against BROWN, despite the CONSPIRATORS

knowing that PLAINTIFF wase making financial decisions based on the inaccurate and fraudulent information provided to PLAINTIFF by the CONSPIRATORS.

108.    Moreover, WAGNER, YAQUB, COUTURIER and SOMOV fraudulently concealed the nature and extent of their fraud from PLAINTIFF, by failing to speak truthfully about FIRSTGEN, by falsifying or altering material and important information, and by making partial disclosures that were misleading on purpose.

109.    Yet the conspirators, WAGNER, YAQUB, COUTURIER and SOMOV, knew (or should have known) that these material facts should have been disclosed to PLAINTIFF.

110.    Each conspirator knew or should have known that the conspiracy's concealment (including via silence) of genuine financial and operational material from PLAINTIFF, falsifying or altering material and important information, and making misleading partial disclosures would induce PLAINITFF to not only make the INITIAL INVESTMENT but to also not assert and pursue claims against the CONSPIRATORS.

111.    Each member of the conspiracy, WAGNER, YAQUB, COUTURIER and SOMOV, knowingly and voluntarily did their part to ensure that the "unlawful and fraudulent" conduct was not disclosed to PLAINITFF.

112.    When WAGNER, YAQUB, COUTURIER and SOMOV joined this conspiracy, each knew and approved of the prior acts of his co-conspirators, including the improper withdrawals made by WAGNER from FIRSTGEN accounts for his own use and enjoyment.

113.    Each act done by WAGNER, YAQUB, COUTURIER and SOMOV in furtherance of the conspiracy became the act of each other, and each co-conspirator is responsible for the result, such that the CONSPIRATORS are jointly and severally liable for their co-conspirators' respective actions.

114. To his detriment, PLAINTIFF relied upon the false statements of material fact and omissions of material fact described herein by the CONSPIRATORS.

115. As a direct and proximate result of this civil conspiracy and the tortious and illegal acts committed in furtherance of it, PLAINITFF was damaged.

116. WAGNER, YAQUB, COUTURIER and SOMOV's participation was a fraud upon PLAINTIFF, was a substantial factor in causing harm to PLAINTIFF, and the damages suffered by the PLAINTIFF are a direct and proximate result of the actions of the CONSPIRATORS.

**WHEREFORE**, PLAINTIFF demands judgment against WAGNER, YAQUB, COUTURIER and SOMOV due to their civil conspiracy to defraud for compensatory damages of not less than **SEVEN MILLION, ONE HUNDRED AND FORTY THOUSAND AND NO/100 (US\$7,140,000.00,)** calculated as a rightful ERC COMMISSION of **SIX MILLION NINE HUNDRED AND SIXTY THOUSAND AND NO/100 DOLLARS (US\$6,960,000.00)** to BROWN and the return of BROWN's INITIAL INVESTMENT of **ONE HUNDRED AND EIGHTY THOUSAND AND NO/100 DOLLARS (US\$180,000.00)**, reserving the right to seek punitive damages later upon a proper proffer, prejudgment interest, and court costs.

## VERIFICATION

STATE OF  California
COUNTY OF  San Francisco

Before me, the undersigned authority, duly authorized to administer oaths and take acknowledgments, personally appeared AJ BROWN, who, after being first duly sworn, deposes and certifies under penalty of perjury, and says that he has read the foregoing Verified Complaint and states that the facts and matters alleged and contained therein are true and correct to the best of his knowledge and belief.

Pursuant to 28 USC § 1746 and §§ 92.52 and 92.525, Fla. Stat., I declare under penalty of perjury that the foregoing Verified Complaint is true and correct to the best of my knowledge and belief,

AJ BROWN

## NOTARIZATION
*Pursuant to §117.05(13)(a), Fla. Stat., Individual Capacity*

STATE OF ___CALIFORNIA___
COUNTY OF ___SAN FRANCISCO___

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfullness, accuracy, or validity of that document. |
| --- |

Sworn to (or affirmed) and subscribed before me by means of [X] physical presence or [ ] online notarization, this __5TH__ day of __September__ 2025, by AJ BROWN.

(NOTARY SEAL)
ALAN GEORGE WEEDMAN
COMM. #2418433
Notary Public · California
San Francisco County
My Comm. Expires Sep. 25, 2026

Notary Public

~~Personally Known by Me~~ [ ] OR Produced Identification X

Type of Identification Produced __DRIVERS LICENSE__

Dated: __4/22/2025__

Respectfully submitted,

*/s/ M. Vincent Pazienza*
M. Vincent Pazienza, Esq.
Florida Bar Nº: 0096479
Member of the Court's Bar
U.S. District Court for the
Middle District of Florida
**PazLaw®, PLLC**
23110 State Road 54, #277
Lutz, Florida 33549-6933
Tel: (813) 949-9595 - Fax: (813) 949-8686
Primary e-mail: Vincent@PazLaw.com
Secondary e-mail: SNathe@PazLaw.com
*Counsel for Plaintiff AJ Brown*